FILED

2012 Mar-01  PM 04:20
U.S. DISTRICT COURT
N.D. OF ALABAMA



## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | |
|---|---|
| ROBERT MAKOHIN, derivatively on behalf of WALTER ENERGY, INC.,<br><br>       Plaintiff,<br><br>v.<br><br>HOWARD L. CLARK, JR., JERRY W. KOLB, PATRICK A. KRIEGSHAUSER, JOSEPH B. LEONARD, BERNARD G. RETHORE, MICHAEL T. TOKARZ, A.J. WAGNER, DAVID R. BEATTY, KEITH CALDER,  WALTER J. SCHELLER, III, and GRAHAM MASCALL ,<br><br>       Defendants,<br><br>and<br><br>WALTER ENERGY, INC., a Delaware Corporation,<br><br>       Nominal Defendant. | Civil Action No. _____<br><br>**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

## NATURE AND SUMMARY OF THE ACTION

1.      This is a shareholder derivative action brought by plaintiff, a shareholder of Walter Energy, Inc. ("Walter" or the "Company"), on behalf of the Company against certain of the Company's current and former directors. This action seeks to remedy the defendants' breach of fiduciary duty from April 20, 2011 to September 21, 2011 (the "Relevant Period").

2.     Walter describes itself as a leading producer and exporter of metallurgical coal for the global steel industry and also produces steam coal, coal bed methane gas ("natural gas"), metallurgical coke and other related products.

3.     This action arises out of the Individual Defendants' (as defined herein) improper statements concerning the Company's business operations and financial results. From April 20, 2011 to September 21, 2011, the Individual Defendants caused the Company to issue improper statements in its public filings, press releases, and conference calls that touted the Company's business operations and financial results. However, unbeknownst to the public was the fact: (1) that the Company was experiencing difficulties in their Alabama and Northeast British Columbia operations that was adversely affecting their production and sales results; (2) that the Company committed to ship approximately 700,000 tons of coal during the second quarter of 2011 at first quarter of 2011 sales prices, leading to a significant reduction in the Company's expected sales results for the quarter, and; (3) that, as a result, the Company's production and sales results were well below expected levels.

4.     Meanwhile, the Individual Defendants knew and had reason to suspect that the Company's internal controls over financial reporting were not functioning properly, that the Company was having production and sales problems, and that the statements being issued during the Relevant Period were materially false and/or misleading. Notwithstanding the above, the Individual Defendants consciously disregarded their duty of oversight and their duty to ensure that the Company's financial reporting system was adequate, but rather allowed the Company to issue the materially false and misleading statements. When the truth about the Company was revealed, Walter Energy's stock price fell from $110.48 per share on August 3, 2011 to $66.25 on

September 21, 2011, representing a *40% percent* decrease and equating to a market capitalization drop of *over $2.7 billion*, and investors filed a securities fraud class action against the Company.

5.      The Individual Defendants' breaches of fiduciary duties have caused substantial damages to the Company including damage to Walter's reputation, goodwill, and standing in the business community, as well as the resultant loss of business and business opportunities; legal fees, costs and potentially huge amounts payable in settlement or satisfaction of class action lawsuits alleging violations of federal and state laws, including one that has already been filed against the Company; the costs incurred in initiating an internal review or an internal investigation into the improprieties engaged in by the Company, its officers, and directors; costs incurred from compensation and benefits paid to the Individual Defendants who have breached their duties to Walter; increased cost of capital; and a loss in market value and shareholder equity.

6.      Plaintiff, on behalf of the Company, now seeks to hold these fiduciaries accountable for their misconduct.

## JURISDICTION AND VENUE

7.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(3) in that Plaintiff and defendants are citizens of different states, and certain defendants are subjects of a foreign state, and the matter in controversy exceeds $75,000.00, exclusive of interests and costs. Plaintiff is a citizen of California and no defendant is a citizen of California.

8.      This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

9.      Venue is proper in this district because nominal defendant Walter maintains its principal executive offices in this district.

## PARTIES

10.    Plaintiff Robert Makohin is a current shareholder of Walter and held Walter common stock during the Relevant Period. Plaintiff is a citizen of the state of California.

11.    Nominal Defendant Walter is a corporation organized and existing under the laws of Delaware. Walter has its principal executive offices located at 3000 Riverchase Galleria, Suite 1700, Birmingham, Alabama 35244. Walter is engaged in the production and export of metallurgical coal for the global steel industry and also produces steam coal, coal bed methane gas (natural gas), metallurgical coke, and other related products. The Company operates in three business segments: Underground Mining, Surface Mining and Walter Coke. During the year ended December 31, 2010, the Company operated six mines.

12.    Defendant Walter J. Scheller, III ("Scheller") has served as Chief Executive Officer and a director of the Company since September 12, 2011, after serving as President and Chief Operating Officer of the Company's primary subsidiary, Jim Walter Resources since June 2010. Scheller is a member of the Executive Committee. He also served as Senior Vice President—Strategic Operations and then as Group Executive—Colorado Operations at Peabody Energy Corporation. Prior to his career at Peabody, Scheller was Vice President for CNX Gas Corporation—Northern Appalachia Gas Operations, and he held a number of executive and operational roles at Consol Energy. Scheller is a citizen of Pennsylvania.

13.    Defendant Michael T. Tokarz ("Tokarz") has served as a director of the Company since 1987. In addition, Tokarz has served as the Company's non-executive Chairman since December 2006. Tokarz is a member of the Compensation and Human Resources Committee, the Executive Committee, and the Nominating and Corporate Governance Committee. Tokarz has been a member of the Tokarz Group, LLC since 2002. Prior to this, from 1996, Tokarz was a

senior General Partner and Administrative Partner at Kohlberg Kravis Roberts & Co., a private equity firm. Tokarz has also served as a director of both Dakota Growers Pasta Company, Inc. and MVC Capital, Inc since 2004. In addition, Tokarz has served as a director of CNO Financial Group since 2003, IDEX Corporation since 1987, Mueller Water Products, Inc. ("Mueller") since 2006, and Walter Investment Management Corp. since 2009. Tokarz is a citizen of New York.

14.    Defendant David R. Beatty ("Beatty") has served as a director of the Company since 2011. Beatty serves on the Compensation and Human Resource Committee and Nominating and Corporate Governance Committee. In addition, he is Chairman of Inmet Mining Corporation and is a director of the Bank of Montreal and FirstService Corporation. Beatty is a citizen of Canada.

15.    Defendant Jerry Kolb ("Kolb") has served as a director of the Company since 2003. Kolb is the Chair of the Environmental, Health & Safety Committee, and is a member of the Audit Committee. Kolb was a general partner and the Vice Chairman of Deloitte & Touche LLP ("Deloitte") from 1986 until his retirement in 1998. In addition to his position as Vice Chairman, Kolb served as Chief Financial Officer of Deloitte from 1985 through 1992 and Chief Administrative Officer from 1985 through 1991. Kolb joined Deloitte in 1957. Kolb is a certified public accountant. Since 2006, Kolb has served as a director of Mueller. Kolb is a citizen of Connecticut.

16.    Defendant Howard L. Clark, Jr. ("Clark") has served as a director of the Company since 1995. Clark is the Chair of the Executive Committee and is a member of the Nominating and Corporate Governance Committee, the Environmental, Health, & Safety Committee, and the Audit Committee. Clark has been Vice Chairman of Barclays Capital, the investment banking

division of Barclays Bank PLC, since September 2008. Prior to joining Barclays Capital, Clark was Vice Chairman of Lehman Brothers Inc., from 1993 until 2008, and Chairman and Chief Executive Officer of Shearson Lehman Brothers Holding, Inc., an investment banking firm, from 1990-1993. Clark was previously at American Express Company holding various senior executive positions, including Executive Vice President and Chief Financial Officer. Since 2006, Clark has served as a director of Mueller. Clark is a citizen of Connecticut.

17.     Defendant Patrick A. Kriegshauser ("Kriegshauser") has served as a director of the Company since 2006. Kriegshauser is the Chair of the Audit Committee, and is a member of the Environmental, Health & Safety Committee and the Compensation and Human Resources Committee. Kriegshauser has been Executive Vice President, Chief Financial Officer and a principal owner of Sachs Electric Company, a specialty electrical and design firm, since February 2000. From 1985 to 2000, Kriegshauser served in various executive capacities for Arch Coal, Inc., a steam coal producer, last serving as Senior Vice President and Chief Financial Officer from 1996 through 2000. Kriegshauser is a certified public accountant. Kriegshauser is a citizen of Missouri.

18.     Defendant Joseph B. Leonard ("Leonard") has served as a director of the Company from 2005-2007 and from 2009 to the present. Leonard served as Walter's Interim CEO from March 2010 through March 2011, and served again as Interim CEO from July 31, 2011 until September 12, 2011. Leonard is a member of the Executive Committee and the Environmental, Health & Safety Committee. Leonard previously served as Chairman of AirTran Holdings, Inc. from 2007 until his retirement in June 2008. From 1999 through 2007, he served as Chairman and Chief Executive Officer of AirTran Holdings, Inc., with the additional title of President from 1999 through 2001. During the last five years, Leonard has served as a director of

6

Air Canada, (2008-present) and Mueller (2006-present). Leonard is a citizen of Florida.

19.     Defendant Graham Mascall ("Mascall") has served as a director of the Company since 2011. Mascall is a member of the Environmental, Health & Safety Committee. Mascall, 65, has been Chief Executive Officer of Ncondezi Coal Company Ltd, an exploration and development company with coal assets in Mozambique, since December 2009. Mascall previously served as Chief Executive Officer of Lubel Coal (UK) Ltd, from 2006-2009. During the last five years, Mascall has served as a director of Anglo Asian Mining PLC, a producer of gold in Central Asia (2006-2007), Caledon Resources plc, a coking coal producer in the Bowen Basin of Queensland, Australia (2003-2010), Gemfields Resources plc, a colored gemstone producer (2009-present), Katanga Mining Ltd, a (2007-2008), London Mining plc, an iron ore development company (2010-present), Lundin Mining Corporation, a diversified base metals mining company (2006- 2007), Ncondezi Coal Ltd, an exploration and development company with coal assets in Mozambique (2009-present), Uramin Inc., an international uranium mining company (2005-2007), and Western Coal Corp., a producer of high quality metallurgical and compliant thermal coal (2010-present). Mascall is a citizen of the United Kingdom.

20.     Defendant Bernard G. Rethore ("Rethore") has served as a director of the Company since 2002. Rethore is the Chair of the Nominating and Corporate Governance Committee and is a member of the Executive Committee. Rethore has been Chairman of the Board, Emeritus of Flowserve Corporation, a manufacturer of pumps, valves, seals and components, since April 2000. From January 2000 to April 2000 he served as Flowserve Corporation's Chairman. He had previously served as Chairman and Chief Executive Officer of Flowserve Corporation from July 1997 through January 2000 and held the additional title of President from October 1998 to July 1999. During the last five years, Rethore has served as a

director of Belden, Inc., a manufacturer of signal transmission products (1997-present), Dover Corp., a manufacturer of a wide range of proprietary products (2001-present), Mueller Water Products, Inc., a manufacturer and marketer of water infrastructure and flow control products (2006-present) and Maytag Corp. (1994-2006), a leading manufacturer of residential and commercial appliances. Rethore is a citizen of Arizona.

21.     Defendant A.J. Wagner ("Wagner") has served as a director of the Company since 2007. Wagner is the Chair of the Compensation and Human Resources Committee and is a member of the Audit Committee. Wagner has served as President and CEO of AJ Wagner & Associates, LLC, a business consulting organization specializing in automotive, financial, lending and insurance advisory services since 2007. From 1973 until his retirement in 2006, Wagner served in various executive capacities for Ford Motor Company, culminating in his appointment as President of Ford Motor Credit North America and Vice President of Ford Motor Company. During the last five years, Wagner served as a director of Lithia Motors, Inc., an automotive company (2008-2009). Wagner is a citizen of Michigan.

22.     Defendant Keith Calder ("Calder") served as Chief Executive Officer of the Company from April 1, 2011 and a director of the Company from April 20, 2011, until his resignation from both positions on July 31, 2011. Calder is a citizen of Canada.

23.     Defendants Beatty, Clark, Kolb, Kriegshauser, Leonard, Mascall, Rethore, Tokarz, Wagner, Scheller, and Calder are referred to herein as the "Individual Defendants." Defendants Kolb, Clark, Kriegshauser, and Wagner are referred to herein as the "Audit Committee Defendants."

### DUTIES OF THE INDIVIDUAL DEFENDANTS

24.     By reason of their positions as officers and/or directors of the Company and because of their ability to control the business and corporate affairs of the Company, the

8

Individual Defendants owed the Company and its shareholders the fiduciary duties of good faith, trust, loyalty, and due care, and were and/or are required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner. The Individual Defendants were and/or are required to act in furtherance of the best interests of the Company and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interests or benefits. Each director and officer of the Company owed to the Company and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets, and the highest obligation of fair dealing.

25.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of the Company, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

26.     To discharge their duties, the officers and directors of Walter were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial and operational affairs of Walter. By virtue of such duties, the officers and directors of Walter were required to, among other things:

    a.  Manage, conduct, supervise, and direct the business and internal affairs of Walter in accordance with the laws and regulations of Delaware, the United States, and pursuant to the charter and bylaws of Walter;

    b.  Neither violate, nor knowingly permit any officer, director, or employee of Walter to violate applicable laws, rules, and regulations;

    c.  Remain informed as to the status of Walter's operations, and upon receipt of notice or information of imprudent or unsound practices, to make a reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices and make such disclosures as are necessary to comply with applicable laws and regulations;

d.  Establish and maintain systematic and accurate records and reports of the business and internal affairs of Walter and procedures for the reporting of the business and internal affairs to the Board of Directors and to periodically investigate, or cause independent investigation to be made of, said reports and records;

e.  Maintain and implement adequate and functioning systems of internal legal, financial and management controls, such that Walter's operations would comply with all laws, Walter's financial statements and information filed with U.S. financial regulators and disseminated to the investing public and Walter shareholders in the Company's Annual and Quarterly Reports would be accurate, and the actions of its directors would be in accordance with all applicable laws; and

f.  Exercise reasonable control and supervision over the public statements to the securities markets, investors and public shareholders of Walter by the officers and employees of Walter and any other reports or other information required by law from Walter and to examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of Walter and to make full and accurate disclosure of all material facts concerning, *inter alia,* each of the subjects and duties set forth above.

27.     During the Relevant Period, the Individual Defendants, as senior executive officers and/or directors of Walter, were privy to confidential and proprietary information concerning Walter, its operations, products, business relationships, insider deals, financial condition, and future prospects via access to internal corporate documents, conversations, and connections with other corporate officers and employees, attendance at management and Board meetings, and committees thereof and via reports and other information provided to them in connection therewith. Because of their possession of such information, the Individual Defendants knew or recklessly disregarded the fact that adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

28.     The Individual Defendants are liable as direct participants in, and as co-conspirators, with respect to the wrongs complained of herein. In addition, the Individual Defendants, by reason of their status as senior executive officers and/or directors had the power

and influence to cause the Company to engage in the unlawful conduct complained of herein. The Individual Defendants, because of their positions with the Company, controlled and/or possessed the authority to control the contents of its reports, press releases, and presentations to shareholders and the public. The Individual Defendants had the ability and opportunity to prevent their issuance or cause them to be corrected.

29.     As senior executive officers and/or directors of a publicly-traded company whose common stock was, and continues to be registered with the SEC pursuant to the Exchange Act, and trades on the New York Stock Exchange under the ticker symbol WLT, the Individual Defendants were, and continue to be, governed by the federal securities laws, and had a duty to disseminate accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings, and present and future business prospects; and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of Walter's common stock would be based upon truthful and accurate information. The Individual Defendants' misrepresentations during the Relevant Period violated these specific requirements and obligations. Accordingly, Individual Defendants' breached their fiduciary duties by causing and or recklessly permitting violations of federal securities laws.

30.     Presently, Walter's Board of Directors (the "Board") consists of ten (10) directors: Beatty, Clark, Kolb, Kriegshauser, Leonard, Mascall, Rethore, Tokarz, Wagner, and Scheller. As established *infra,* Walter's Board is unable to make an impartial determination as to whether to institute legal proceedings to redress the wrongdoing alleged herein because a majority of its members: (1) face a substantial likelihood of liability for non-exculpated breaches of their fiduciary duties to the Company by their participation or acquiescence in the wrongdoing

alleged herein and/or complete failure to perform their oversight duties to the Company, failure to implement internal controls sufficient to reasonably assure that the Company's statements were accurately prepared and presented, failure to oversee the Company's compliance with legally mandated disclosure standards; and/or (2) lack independence from the Company and are thus incapable of rendering a disinterested decision on whether to pursue a derivative claim.

## FURTHER SUBSTANTIVE ALLEGATIONS

31.     Walter is engaged in the production and export of metallurgical coal for the global steel industry and also produces steam coal, coal bed methane gas (natural gas), metallurgical coke, and other related products.

*False and Misleading Statements During the Relevant Period*

32.     On April 20, 2011 Walter issued a press release announcing its financial results for its 2011 fiscal first quarter, the period ended March 31, 2011. The Company reported earnings of $81.8 million, or $1.53 per diluted common share. In the press release, defendant Calder spoke about Walter's strong growth prospects and bright outlook, and in particular the Company's strong prospects with regards to the Company's 2011 sales volume. The press release stated as follows:

> Walter Energy Announces First Quarter 2011 Results
>
> Company Reports Earnings of $1.53 per Diluted Share and Net Income of $81.8 Million, **Both Almost Double Compared to First Quarter 2010**
>
> EBITDA of $148.1 Million, Up 58 Percent
>
> **Underground Mining Segment Nearly Doubles Operating Income**
>
> 2011 Full-Year Business Outlook
>
> As previously announced, Walter Energy acquired Western Coal on April 1, 2011. Sales volume expectations for both legacy Walter Energy and legacy

Western Coal are as follows:

**The Company expects full year metallurgical coal sales from the Walter Energy Alabama underground operations of 7.5 million to 8.0 million short tons. In addition, the Walter Energy Alabama surface operations expect to sell between 1.4 million and 1.6 million short tons of thermal coal for the full year.**

From the legacy Western Coal operations, **the Company expects metallurgical coal sales of between 4.9 million and 5.3 million metric tons for the period of April 1, 2011 to Dec. 31, 2011**. The Company expects thermal coal sales of 1.0 million to 1.2 million metric tons for the same period from these operations.

*       *       *

Defendant Calder commented on the Company's results, stating, in pertinent part:

We generated strong year-over-year growth in revenues and income **driven primarily by the third highest coking coal pricing we have ever achieved,**" Now that our acquisition of Western Coal is complete, we can turn our attention to delivering on our promises, executing integration activities and framing future growth opportunities. (Emphasis added.)

33.     On April 21, 2011 Walter held a conference call for analysts, investors, and the media to discuss the Company's first quarter results and future prospects. Prior to such conference call, the Company provided investors with certain financial information about the Company.  In the materials, the Company indicated that "markets remain strong" and that "Q2 - 2011 prices at record levels", as follows:



**Markets remain strong**

## Seaborne metallurgical coal

- Slow recovery of Australian supply
- Demand steady
- Q2-2011 prices at record levels
  - HCC > US$300 per tonne; LV PCI > US$270 per tonne

## Steel industry

- Increasing finished steel prices during Q1

34.    Defendant Scheller made positive statements about the average coal sales prices and the reasons for reduced production volumes, which Defendant Scheller indicated were "moving forward" and "progressing" at "improved" and "more normal" rates, stating, in pertinent part:

Sales volumes of 1.8 million tons for Q1 were down 6.4% compared to the same period last year. The lower sales volume reflects lower production and inventory levels. **Our average coal sales price at the underground segment in the quarter was $194 a ton, up 52% over the same quarter last year. Benchmark prices in the first quarter of 2011 were higher than those in the first quarter of 2010 and we sold carryover tonnage from the previous year in the first quarter which somewhat reduced the increase and average sales price and percentage increase.**

Average production cost for the underground mining segment was $69 per ton, a 19% increase over last year. The higher costs primarily were due to higher labor costs as we increased manpower to run more continuous miner sections and also resulted from reduced production volumes as a result of weak roof conditions, ventilation and construction projects, and a two week squeeze on the lower wall at the number four mine in January.

Moving on to the quarterly coking coal production volumes on slide 14, we are **positioned to expand production for an 8 million ton annual run rate as we move forward.** We had two long wall moves and produced 1.6 million tons in the first quarter, which was 4.6% less than the same period a year ago. **This**

14

**quarter's long wall moves and improved continuous miner advance rates establish a foundation to moving forward at production at improved rates.**

Mine four production was impacted in Q 1 by a couple of issues. The ventilation and construction issues were due to delayed completion of a new ventilation shaft which encountered several disturb zones due to sub surface faulting which has caused considerable delay. **The shaft development is now progressing at a more normal daily rate and should be operational in Q2.**

The long wall performance was a challenge throughout the N 19 panel which began in Q4 and was completed in March of this year. A two-week shield squeeze followed by continued roof leak conditions slowed production rates. We moved from the N19 panels to the S2 panel which began in late March. **This will eliminate the roof control issues we encountered in N19.** At mine seven, **the number one long wall had had difficult cutting conditions which required reduced cutting rates** and increased maintenance to keep tools adequate for the task. These conditions impacted both Q4 and Q 1.

**The long wall was moved from the J panel to the K panel in February and the cutting conditions are improved.** Additionally, both long walls at mine seven were impacted due to the need to address ventilation issues during the first part of the long wall panel. These issues resulted in reduced production rates. The changes which have been completed coupled with those that are planned will continue to protect our miners.

As indicated on slide 15, our surface mining operations experienced a record sales quarter with revenues higher by 30% year-over-year. This strong percentage was tempered to some extent by higher ratios as well as increases in diesel fuel and blasting costs; Now to Walter Coke. On slide 16 you will see Walter Coke's operating margin was strongly positive as a result of solid production increases and favorable pricing in its primary market. (Emphasis added.)

35.     On the same call, Company executive Neil Winkelmann ("Winkelmann")

discussed the Company's purportedly improving coal production at Walter's Canadian mines,

including in British Columbia, stating:

Capital expenditure continues to focus on the development of the metallurgical coal assets. **The mines have ramped to be producing at a total rate of 6 million tons per annum, with two of the past three quarters in excess of 1.5 million tons, and the recent quarter of 1.4 million tons in spite of operational and logistics issues.**

Moving on to slide 19, I will first discuss our Wolverine mine in northeast British Columbia, our flagship operation in Canada. **It's a mature steady state open pit mine that produces more than 2 million metric tons per year of high quality**

for (inaudible) **coking coal from multiple complex seams.** Over the past year the focus at Wolverine has to put into place new, larger and more productive equipment. In parallel we have implemented productivity improvement programs to offset cost pressures and to improve operating efficiency. The images on the slide show our existing mine site as well as the coal processing plant and rail load out facilities.

**These facilities are potentially able to process and load out more than 3 million tons per year of clean coal.** Also on the slide is one of the new Hitachi EX5500 27 cubic meter hydraulic shovels that we commissioned during the past year. **We are now evaluating a major extension of the mine life whilst also potentially further increasing production rates.** In summary, this mine has become a model for the development of our other two mines in northeast British Columbia.

Moving on to slide 20 and to our Brule mine. This mine produces one of the best quality, highest coke replacement ratio low volatile PCI product in the world for our Asian customers. **Over the past year are the [SIC] focus has been to expand the mining operation into a new larger pit. The mine production rate will grow to 2 million metric tons per year of production, utilizing equipment and newer onsite infrastructure.** The capital investment in this mine is approximately 70% complete. The mine does not have its own processing or load-out facility and prior to Q1 2011, the quote at commissioning of the new Falling Creek connector road, Brule's coal was being trucked by highway to the facilities **at either Wolverine, Willow Creek, or to a third party load-out.**

**With the newly commissioned road, the majority of the coal from Brule can go directly to Willow Creek's production and load-out facilities without highway travel, thus reducing transportation costs and enabling Brule to increase production to the targeted 2 million metric tons per year run rate by middle of this year.** It is worth noting that the majority of coal from this mine is shipped to customers without the need for beneficiation other than mine-site crushing. The pictures on this slide show the mine site in the summer of 2010 as well as the EX8000 shovel and the 793 haul trucks in which they have deployed several.

Moving on to slide 21 and our Willow Creek mine. We restarted this mine in June 2010 and to date it's been a very successful startup. The open pit mine produces a mix of top quality low volatile PCIs and a very high quality hard coking from complex geology. Willow Creek has a preparation plant and rail load-out. **We are expanding production to 1.7 million metric tons per year and expect to receive the relevant permits shortly.** The capital program in 2011 will be to expand the mine bringing in new, larger equipment and to expand the processing plant and coal handling facilities to handle increased tonnage. Overall the capital program is 20% complete with substantial completion by the end of Q1 2012.

Further exploration and evaluation will be undertaken this summer in Willow

Creek South, potentially increasing mine life in reserve. **Overall the performance at the northeast British Columbian assets has improved significantly throughout the year resulting in production of under 4 million metric tons for the 12-month period to the end of March 2011.** This has been a great start to an ambitious expansion program that will continue throughout 2011 and beyond. (Emphasis added.)

36.     Also on the same call, Calder stated that the market fundamentals for coal were

strong and made positive statements about existing market fundamentals and forecasted rising

demand for the Company's products. Calder stated, in part:

I would like to first make a few comments about the coal market and refer you to slide number 28. **The market fundamentals for internationally traded met coal remain very strong in Q1, 2011,** largely due to continued rains in Queensland, where about 15 million to 20 million tons of export production was lost. **In addition, the fundamentals on the demand side of the equation look strong as well.** For example, the World Steel Association recorded that crude steel production for February **was 117 million tons or 8.8% higher than February of the previous year. And the full year of 2011 appears to be on track to at least match 1.4 billion tons produced in 2010, which itself was up 15% over 2009**.

Looking closer at specific economic reasons we sell into, let me first say our thoughts go out to those in Japan who are continuing to deal with the terrible tragedy of the earthquake and tsunami of March 11th. The long-term economic impact for Japan are slowly emerging, and it appears that the automotive sector appears to be hardest hit due to its structure of plants and manufacturing specialty parts. Japanese economists expect a short recession, lasting from one to two quarters are followed by growth fueled by rebuilding in 2012. **However at this stage we are not seeing any impact on our shipments.**

GDP growth **in China and India**, two key sectors for the metallurgical coal supply, is forecasted to be 9.6% and 8.2% representatively. As GDP directly correlates to the use of steel products, **these forecasts are positive for the future demand for met coal**.

**In Europe and South America, crude steel production continues to be strong.** Germany, for example, continues to lead and reached its highest quarterly product in the summer of 2008.

**Looking at the current quarter, second quarter 2011, hard coking coal prices, we settled in line with markets—$326 to $330 per ton**, which is a reflection of the high quality coal we are producing. This increase is nearly 50% higher than the previous quarter.

17

With regard to the low-vol PCI coal we produce in northeastern British Columbia, **Q2 prices have been in the area of $275 per ton, which represents 83% of the hard coking coal settlement. This is the high end of historic ratio levels.** In short, worldwide demand for metallurgical coal remains strong throughout January and March and the longer term outlook is firm and as the economic recovery continues in developed economies and expands in the major growth regions of China, India and Brazil. **Q2 pricing is very strong and we continue to see exceptional interest in a demand for all of our coal products.**

Moving on to slide 30, this illustrates our expected coal sales growth for 2012. **For 2011 the Company expects full year met coal sales from our Alabama underground operations of 7.5 to 8 million short tons including up to 500,000 tons of purchase coal.**

In addition, **the Alabama surface operation is expected to sell between 1.4 and 1.6 million short tons of thermal coal for the full year. From the legacy Western Coal operations, the Company expects metallurgical coal sales of between 4.9 million and 5.3 million metric tons for the period of April 1st to December 31st, 2011. The Company expects thermal coal sales of 1 million to 1.2 million metric tons for the same period from our operations.**

But this is only part of the story. The growth shown here only reflects current operations and does not include the depth of our project portfolio. Over the coming months our team will be meeting and developing the Company's long-term strategy and over time will be in a position to share with you more details about our extensive pipeline of projects. (Emphasis added.)

37.     Furthermore, Calder explained that Walter's coal production was "priced and sold" through the second quarter. Specifically, Walter, as a primarily seaborne met coal producer, enjoyed the benefit of quarterly pricing that is established in the month preceding the end of preceding quarter. Calder's pricing explanation, in relevant part, follows:

<u>Jim Rollyson - Raymond James, Analyst:</u>

That's very helpful and Keith, maybe you can provide a little bit of color across the spectrum of the combined companies now for where your contract position was. I think in the last quarter you were pretty well sold for the first half at the Walter operations, some of that because of carryover coal bled into this year. **But maybe a little color on how to -- where the second quarter, the rest of the year is from a contract standpoint and a pricing standpoint, what is open on**

**the Western side as well?**

Defendant Calder:

**The scenario for both old Walter and old Western is very similar. That is that obviously through the second quarter, our production is priced and sold.** As we go into the second half of the year, all of the materials committed going forward but only 10% is priced. So we're about 90% open on pricing forward and I think it really just demonstrates the commonalty of the philosophical approach of how we see marketing, both before the integration of the two companies and now going forward.

Jim Rollyson - Raymond James, Analyst:

When we think about pricing metals, particularly on the met side for Q2, do you think about that somewhere bridging the gap between where pricing was Q1 and previously where the benchmarks have been recently set somewhere in the middle, maybe?

Defendant Calder:

That's a very good way of looking at it. Because as you know we did sell some material both from the old Western and legacy Walter board for half the year. So some of that will be a little carryover in both areas coming out of Alabama. So that's a good way of looking at it. It's sort of a combination of middle ground between the two.

Jim Rollyson - Raymond James, Analyst:

And just a last one—

Defendant Calder:

One thing I think is important to note -- sorry for interrupting but just to finish that. **It is important to note that all of our products tend to lean toward the higher end of the benchmark pricing range** whenever we place those contracts - just a reflection of the high quality of the product that we sell.

\*       \*       \*

Lucas Pipes - Brean Murray, Analyst:

That's fair. As a followup, as you mentioned, you still have to price a good amount of coal in the second half of the year. Could you tell us about when you want to price these volumes? Are you trying to get them out now? The pushback from your customers -- how are they seeing things? Are they trying to maybe hold off a little bit and then price more in the second half of the year? What is your strategy there?

Defendant Calder:

Well, 1 think it's important to note that **Walter Energy is first and foremost a seaborne met coal producer so we sit well in the seaborne met coal pricing mechanisms. The bulk of that, vast majority is done on a quarterly basis -- so pricing for Q3 would be executed in June. So that pricing would be established in June. The pricing for the following quarter, obviously in the last month of the third quarter. There are -- sometimes we find there's an opportunity and a desire on the part of our customers to establish a six monthly contract or nine monthly contract, we do that occasionally. But first and foremost and overall, because we are a seaborne met coal producer we are for the most part in the quarterly pricing stage.** Now, on the other hand, we do have long-term contracts with the vast majority of our customers. And that means that the volumes are contracted two and three and four years out. So we know where our volumes are going for Q2 and Q3. It is now a question of defining that price and hence the seaborne bench mark is what we work on.

\*        \*        \*

Mitesh Thakkar - FBR Capital Markets, Analyst:

Will stay about the same. Okay. And one final question. And this is just in general, about the pricing side. I know you talked about a strategy going forward on the quarterly and -- you know, on a case by case basis, maybe a six-month contract but will you follow the same strategy in terms of your low-vol PCI side?

Defendant Calder:

Low-vol PCI -- this is Keith speaking again -- low-vol PCI also trades on a seaborne market and it trades exactly the same way. It is quarterly pricing, the bulk of it. Last month in the quarter is when we establish the pricing for the next quarter. But the totality of our production is all long-term contracts to well established customers on a multi-year basis. So volumes and long-term contracts, pricing on a quarterly basis, with some exceptions. (Emphasis added.)

38.    In addition, on the April 21st conference certain Individual Defendants, including defendants Calder and Scheller, as well as other company executives made positive comments about transportation and production related issues experienced during the first quarter of 2011, stating, in part:

Brian Gamble -Simmons and Co., Analyst:

Good morning, guys. A couple of things. I wanted to start with transport and port operations, specifically in Mobile and through Canada. Maybe you can give us trend on how both regions have been performing year to date and expectations moving forward in the year.

Defendant Calder:

Fortunately I have both Jim Griffin and Mike Madden with me. So I'll hand this over. Maybe Jim you can tackle northeast BC and ports out of Ridley and Mike can follow up within the McDuffie terminal.

Jim Griffin, Walter's Global Head of Business Development:

**At Ridley what a we really experienced was seasonal weather related issues. We did not have production issues.** Our problems in the first quarter were getting our stockpiles from the mine to the port at Ridley. We worked extensively with CM through this, the combination of too much detail to go into on the phone, but of shifting to steel cars, scheduling and commitment of cars and as we worked with them and Ridley and come out of the cold winner [SIC] season. Because also a lot of it was freezing that occurs in bars, we are experiencing much improved traffic to the tune of twice the daily train traffic. **And we are not letting up on this, but Ridley assisted us and we are currently running at the kind of rate we require and Ridley is performing very well in addition.**

Defendant Calder:

Mike?

Mike Madden, Walter's VP of Sales and Marketing:

Yes, brought in on McDuffie we are seeing, on our side of vessel loadings, mainly lack of coal. We went into January with very low inventory in Mobile and that became further compounded with the mining problems we developed over the quarter. We have made some adjustments on shipping to spread the cargoes out to avoid any serious demerge issues. We also did find another exporter in [M]obile. Their business has come on fairly stronger than we anticipated. So that's caused delays in vessel loadings as well. But all in all, the terminal is operating at a pretty good loading rate. We also entered into an agreement in March with another exporter at McDuffie with the state to go ahead and convert the berth number 1 to an outbound as well. Today it's only an inbound facility. We won't see the benefits of that until sometime second half next year. But that will definitely alleviate any congestion issues going forward.

\*      \*      \*

21

Shneur Gershuni - UBS, Analyst:

Thank you for that clarification. I was wondering if Walt could give us a little color as to the change or the issues that we saw -- you know at that point in the first quarter continuing and expand? Or are we going to get to the point where the second quarter will look like the whatever is the baseline quarter of what the mine should actually operate like and how we should be modeling that on a going forward basis when we talk about 2012 and 2013.

Defendant Scheller:

I think we will see the second quarter -- performance in the second quarter star t to be much more indicative of what we should expect moving forward. We need to remember, we still have several long wall moves toward the end of the year this year. But the problems which we encountered, again, were some of the more located -- at our mine 4, at the long wall panel. So we have moved out of that area of the mine and are now operating actually a few miles away from there. **So we don't anticipate having those same issues. And the problems we were encountering on the -- on both long walls with ventilation, we believe we have made adjustments and changes to equipment and done things to help to alleviate that problem. And we should be able to operate in a more productive mode as we move forward.**

                    *       *       *

Shneur Gershuni - UBS - Analyst:

One final question, if I may -- you mentioned Walter Coke. There's been a lot of talk about a coke battery shortage, and so forth. Is that an opportunity for Walter Coke to take advantage of? Or are you at your limits with respect to your operation?

Chuck Stewart, President, Walter Coke:

This is Chuck. We are pretty well running at capacity now. So the markets are pretty strong. Without additional resources being added someplace, we are pretty well at capacity.

Defendant Calder:

Just to add a little to that, it does mean that coke pricing is attractive right now, and we are getting more opportunities to diversify our customer base if it is attractive to us financially. And that was demonstrated -- I think it's been announced. **We placed two shipments of coke overseas in the last quarter. So coke side of the business is very healthy and similar to the coking coal, the metallurgical side of things, there is strong demand going forward.** (Emphasis added.)

22

39.     On April 28, 2011, Walter issued a press release stating that several tornadoes impacted its Alabama facilities. Despite the storm's impact, Walter announced it expected operations to resume normally, and in fact, that its North Birmingham facility was unaffected. The release stated, in pertinent part:

> "We experienced several large tornadoes near our Alabama operations over the past 24 hours. We had one injury at a surface mining operation which required first aid treatment, but thankfully, we have no other reports of injuries to our employees at this time," Scheller said. "While both the No. 4 and No. 7 mines avoided direct impact by the tornadoes, they experienced power outages which have temporarily impacted production. We expect production to resume as soon as all power is restored and any related underground issues are resolved. Our surface mining operations suffered varying degrees of damage, mostly superficial with the exception of our Taft Choctaw mine, where storm-related damage cut power to the mine and its electrically operated dragline. At this time, we are uncertain how long it will take to restore power to this facility. Our metallurgical coke plant in North Birmingham was unaffected by the storms and is operating normally."

40.     On May 9, 2011, Walter issued a press release announcing that it had leased 85 million tons of recoverable coking reserves in Tuscaloosa County, Alabama from a subsidiary of Chevron. In addition, the Company announced that it acquired Chevron's North River steam coal mine in Alabama. The release stated, in pertinent part:

> Walter Energy (NYSE: WLT) (TSX: WLT), the world's leading, publicly traded "pure play" producer of metallurgical coal for the global steel industry, announced today the execution of mineral leases for approximately 75 million tons of recoverable Blue Creek coking coal reserves in Tuscaloosa County, Ala. from a subsidiary of Chevron Corporation (NYSE: CVX) ("Chevron"). Terms of the leases include royalty rates consistent with existing coal lease agreements.
>
> *     *     *
>
> The Company also announced the completion of Jim Walter Resources' acquisition of Chevron's North River steam coal mine in Fayette County and Tuscaloosa County, Ala. Total consideration for the purchase of the North River mine included a small cash payment and the assumption of certain liabilities, not material to the Company. The transaction is expected to be neutral to slightly accretive to earnings in the first year.

23

41.     On June 30, 2011, Walter issued a press release announcing the resignation of Calder from his position as CEO and director of the Company, effective July 31, 2011. Calder's resignation letter noted that he was resigning "due to differences of opinion concerning management philosophy." Leonard was named by the Board to succeed Calder as Interim CEO at that time until a permanent successor was found. The press release stated, in pertinent part:

> Walter Energy (NYSE: WLT) (TSX: WLT), the world's leading, publicly traded "pure play" producer of metallurgical coal for the global steel industry, announced today that Keith Calder has tendered his resignation as Chief Executive Officer and a director, effective July 31, 2011. The Board has named Board member Joseph B. Leonard to succeed Calder as Interim Chief Executive Officer at that time.

> Leonard served as Walter Energy's Interim Chief Executive Officer from March 2010 through March 2011. The Board has engaged Spencer Stuart to initiate a search, within Walter Energy and externally, for a permanent Chief Executive Officer.

> Calder informed the Board in his letter of resignation that he is resigning due to differences of opinion concerning management philosophy. Said Calder, "I do believe Walter Energy has immense potential and I am sure it will be realized. That said, it is now time for me to move on and pursue other interests."

> Michael T. Tokarz, the non-executive Chairman of the Board, said, "We accept Keith's decision to resign and appreciate his desire to move on. We thank him for helping us through the transition and integration of Walter Energy and Western Coal into one company -- the new Walter Energy. Most important, we are confident that the company, under the direction of Joe Leonard, will continue its current momentum." (Emphasis added)

42.     The statements referenced above in ¶¶ 32-41 were each inaccurate statements of material fact or were materially false and misleading when made because they failed to disclose and misrepresented the following material adverse facts: (a) that the Company was experiencing difficulties in their Alabama and Northeast British Columbia operations that was adversely affecting their production and sales results; (b) that the Company committed to ship approximately 700,000 tons of coal during the second quarter of 2011 at first quarter of 2011

sales prices, leading to a significant reduction in the Company's expected sales results for the quarter, and; (c) that, as a result, the Company's production and sales results were well below expected levels.

*The Truth Emerges*

43.     On August 3, 2011, Walter issued a press release announcing its operating results for its 2011 fiscal second quarter, the period ended June 30, 2011. The Company reported net income of $107.4 million, or $1.71 per diluted common share, for the quarter, substantially less than Wall Street estimates. Then interim CEO, defendant Leonard commented on the Company's operating results, stating, in part:

> Walter Energy continues to execute on its long-term strategic plan to grow its met coal production base, highlighted by the acquisition of Western in April and our execution of lease agreements on 68 million metric tons of Blue Creek coal reserves in May. Those initiatives are beginning to show positive results as we increased met coal sales to a record 2.7 million metric tons in the quarter, and we expect to grow total met coal sales volumes by an additional 50 percent by the end of 2013. In addition, we have further organic and bolt-on growth opportunities in our pipeline to continue increasing and diversifying our metallurgical coal production footprint over the course of this decade to carry on our outstanding track record of creating value for our shareholders.
>
> **During the quarter, we experienced difficult geology in Alabama and weather-related challenges at both our Alabama and Northeast British Columbia operations, which adversely affected production and sales results. We are putting these production issues behind us and expect to finish 2011 with second half met coal sales of approximately 5.9 million metric tons.**

44.     On August 4, 2011, Walter held a conference call for investors, analysts, and the media to discuss the Company' quarterly results. The market was shocked by the magnitude of Walter's earnings miss. For example, the Motley Fool in an August 4, 2011 article entitled Walter Energy Shares Dropped: What You Need to Know" stated:

**What:** It seems like *everything* is down today, but **Walter Energy** (NYSE: WLT) is down more than      most -- 25% and counting. Yowza.

**So what:** Second-quarter "adjusted" earnings came in at $2.36 per share last night -- well over 40%      short of the estimated $3.98-per-share profit. To top it all off, Wall Street investment bankers Brean Murray and KeyBanc both downgraded Walter to "hold" this morning. Ouch.

45.     Analysts were quick to criticize Walter for the severity of its earnings miss. For

example:

BB&T Capital Markets:

**WLT: ABYSMAL QUARTER; DISCLOSURE LACKING**

Key Points:

- **TERRIBLE QUARTER; WORSE DISCLOSURE**. We suspected it would be a challenging, below consensus quarter. **What we got was something far worse.** Last night after the bell, WLT reported Q2 adjusted EPS of $2.36 versus our estimate of $3.90 and consensus of $3.98. EBITDA was equally poor at $276.6M (BB&T=$400.8M; consensus=$424.4M). **The miss was all over the place, but we highlight the top line, where revenues of $773.0M compared to our forecast of $868.4M and consensus of $914.5M. Production was challenged by a myriad of issues, including geological issues in Alabama and weather-related disruptions in both Alabama and Northeast British Columbia.** This affected costs, which appeared to blowout in Canada. From our vantage point, neither the geological issues nor the weather-related disruptions were shocking. **What was shocking was the magnitude of the miss.** Moreover, the complete revamping of how WLT discloses its financial results (i.e. no more Mine No.4 and Mine No.7 production and cost results) was a big surprise and a major disappointment from our perspective. We thought the company took a step backward in that regard.

- **COMPANY REDUCES 2H'11 SHIPMENT GUIDANCE**. In conjunction with the Q2 release, management also lowered 2H'11 met coal shipment guidance. Total met sales for the back half of the year are now expected to be 5.9M metric tons. We were modeling the equivalent of 7.8M metric tons.

Scotia Capital:

**Q2/11 - Significant Miss Can Be Attributed to Carryover Tonnes**

- Walter Energy reported adjusted Q2/11 earnings of EPS of US$2.46, well below both our estimate of US$4.21 and consensus at US$3.98/share. Reported earnings of US$1.71 per share included a number of non-recurring items, mostly related to the Western Coal acquisition which closed early in the quarter.

- **Production was below estimates**, sales volumes were in line. Walter reported production of 3.4Mt coal in the quarter, slightly below our estimate of 3.7 Mt. Sales were 3.7Mt in Q2, in line with our expectations.

- **Selling prices were well below expected levels. Although Walter Energy typically sells hard coking coal at about the Australian prime hard coking coal benchmark price, realized prices in the current quarter were well below the Q2/11 US$325/t benchmark.**

  - **U.S. Operations suffered from significant carryover tonnage at Q1 prices. Hard coking coal from the Alabama Underground Operations sold at an average price of US$236/t, versus the benchmark of US$325/t and our estimate of US$308/t. Management commented on the conference call that ~700,000 tonnes were brought forward from Q1/11, noting the benchmark price in Q1 was US$225/t. As illustrated in Exhibit 2, Walter Energy U.S. Underground Operations realized prices have historically been at or near the benchmark price; the low realized prices in the current quarter are uncharacteristic for the operations.**

  - **Canadian and U.K. Operations were also weaker than expected. Metallurgical coal** (hard coking coal + PCI coal) from the Canadian and U.K. Operations **sold at US$232/t, versus our estimate of US$288/t**. We believe the variance to our estimates is likely attributable to both product mix (i.e., a higher percentage of sales were PCI coal) and due to carryover tonnage obligations.

46.     As the revelations of Walter's true financial and business operations entered the market, to the price of Walter's stock declined approximately 29%, from $110.48 per share on August 3, 2011 to $77.89 on August 4, 2011.

47.     Then on September 21, 2011, Walter issued a press release announcing (a) its attempt to "expand" and "reformat" its historical disclosures, and (b) revisions to its 2011 second half sales expectations. The press release stated, in part:

> To help investors better understand Walter Energy, the Company has expanded its historical statistical disclosure and reformatted it to better describe its current business segments and to provide information by product for the second quarter forward.  For the third and fourth quarters of 2011, the Company is also providing specific guidance for operating income, net income and earnings per share, on a one-time basis.

> Walter Energy's consolidated operating income is expected to be between $125 million and $145 million for the third quarter of 2011 and between $255 million and $295 million for the fourth quarter. Consolidated net income is expected to be between $63 million and $73 million for the third quarter and between $165 million and $185 million for the fourth quarter of 2011. Earnings per share is expected to be between $1.00 and $1.16 in the third quarter and between $2.63 and $2.95 for the fourth quarter of 2011.

Defendant Scheller, who had recently been appointed as the Company's CEO stated:

> Walter Energy is making solid operational progress despite a slower than expected recovery from the 100-year record rainfall experienced in Northeast British Columbia during the second quarter as well as recovery from the difficult geology at Mine No. 7 in Alabama. **These events will cause a delay in the Company's anticipated growth in production and associated improvement in costs.** However we see early recovery today and expect clear improvement beginning in 2012. Longer term, Walter continues to target strong growth in metallurgical production by the end of 2013.

> In the first half of 2011, Walter Energy and Western Coal sold just under 5.2 million metric tons of metallurgical coal (including pre-acquisition sales of Western in the first quarter 2011) and, even with the delayed recovery, we still anticipate a similar level of metallurgical coal sales in the second half of the year of slightly over 5.2 million metric tons. The previous metallurgical coal sales guidance for the second half of 2011 was 5.9 million metric tons.

> *       *       *

> In Alabama at Mine No. 7 we are pleased that we continue to progress through the area of difficult geology, albeit at a slower pace than first anticipated, and we have not encountered further squeeze conditions. **However, our cutting rate over the last 30 days has only averaged approximately 20 feet per day, which is less than the 35 feet per day estimate we had previously assumed.** We currently expect to advance through this area and return to normal cutting rates of

28

45-50 feet per day by mid-October. In addition, we are simultaneously installing a new set of 1,350 ton shields in the new E panel of the mine that are 50% stronger than the current shields in operation. This new E panel of the mine is now scheduled to add production beginning in November.

In addition, Winkelmann stated:

**In Northeast British Columbia we continue to increase production, but at a rate below our previous expectations.** The expansion of the shared wash plant facility that supports the Brule and Willow Creek mines is now scheduled to coincide with the Ridley Terminal rail-car dumping system upgrade. Therefore, we now expect slightly less production in the second half of 2011 than in our previous forecast. **We have also experienced a slower than anticipated improvement in hauling rates along the now operational Falling Creek Connector Road.** But, we expect to see further improvement in hauling rates over the remainder of the year.

48.     In response to this announcement, Walter's common stock declined approximately 12%, from $75.00 per share on September 20, 2011 to $66.25 per share on September 21, 2011.


## DAMAGES TO WALTER

49.     As a result of Individual Defendants' improprieties, Walter disseminated improper statements. These improper statements have devastated Walter's credibility as reflected by the Company's over $2.7 billion market capitalization decline.

50.     Walter also faces damages from a securities class action brought by an investor on January 27, 2012 in the U.S. District Court for the Northern District of Alabama against Walter, Scheller, Calder, and Winkelmann. Among other things, the class action complaint alleges false and misleading statements and material omissions made by the defendants in that case. Further, the class action complaint alleges insider trades that were effectuated by Company officers in that case to take advantage of artificially inflated share prices before the Company's misconduct was revealed. Accordingly, the Company has and will incur costs in investigating and defending Walter and certain officers and directors in the class action lawsuit, in addition to potentially hundreds of millions of dollars in settlement or to satisfy an adverse judgment.

51.     Further, as a direct and proximate result of Individual Defendants' actions, Walter has expended and will continue to expend significant sums of money. Such expenditures include, but are not limited to: costs incurred in initiating an internal review or an internal investigation into the improprieties engaged in by the Company, its officers, and directors; and costs incurred from compensation and benefits paid to the defendants who have breached their duties to Walter.

52.     Moreover, these actions have irreparably damaged Walter's corporate image and goodwill. For at least the foreseeable future, Walter will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have misled the investing public, such that Walter's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## DEMAND WOULD BE FUTILE

53.     Plaintiff brings this action derivatively in the right and for the benefit of Walter to redress injuries suffered, and to be suffered, by Walter as a direct result of breaches of fiduciary by the Individual Defendants. Walter is named as a nominal defendant solely in a derivative capacity. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

54.     At the time of the filing of this action, Walter's Board is composed of ten (10) members: Beatty, Clark, Kolb, Kriegshauser, Leonard, Mascall, Rethore, Tokarz, Wagner, and Scheller. Each of these Board members has been named as a defendant in this action. In addition, defendant Scheller has been named as defendants in a related securities fraud class action lawsuit.

55.     Plaintiff has not made any demand on the Board to institute the causes of action alleged herein because such a demand would be futile. Walter's Board at the time this Complaint was filed was unable to make an impartial determination as to whether to institute legal

proceedings to redress the wrongdoing alleged herein because a majority of its members: (1) face a substantial likelihood of liability for non-exculpated breaches of their fiduciary duties to the Company by their participation or acquiescence in the wrongdoing alleged herein and/or complete failure to perform their oversight duties to the Company, failure to ensure the Company's compliance with legally mandated disclosure standards; and/or (2) are otherwise not independent from the Company.

*Substantial Likelihood of Liability for the Entire Board of Directors*

56.     Demand is also futile and excused because all of the Board members are not disinterested because they face a substantial likelihood of liability for the wrongdoing alleged herein.

57.     The Individual Defendants face a substantial likelihood of liability for their breaches of fiduciary duty because each of the Individual Defendants knew and/or had reason to suspect that the Company's reporting and disclosure system was not functioning properly and that the statements disseminated during the Relevant Period were materially misleading. Despite this, the Individual Defendants consciously disregarded their duty of oversight, allowed the Company to issue the materially misleading statements, and failed to ensure that reliable systems of controls were implemented and functioning effectively to prevent the Company from issuing the materially false and misleading statements. Accordingly, the Individual Defendants face substantial exposure to liability for their total abrogation of their duty of oversight.

58.     Defendants Clark, Kolb, Kriegshauser, and Wagner as members of the Audit Committee, had the responsibility to review the Company's interim financial statements, earnings, press releases, and its earnings guidance. As stated in Walter's Charter of the Audit Committee, its members are responsible for "(i) The quality and integrity of the corporation's

financial statements; (ii) The corporation's compliance with legal and regulatory requirements; (iii) The independent auditor's qualifications and independence; and (iv) The performance of the corporation's internal audit function and independent auditors." As stated in the Company's Schedule 14A Proxy Statement filed with the SEC on March 16, 2011 (the "2011 Proxy"), defendants Kolb, Kriegshauser, and Wagner each "meets the definition of financial expert under the rules of the Exchange Act." As a result of responsibilities within the Company and their financial expertise, the Audit Committee Defendants must have known and/or had reason to suspect that the Company's reporting and disclosure system was not functioning properly and that the statements they were reviewing were materially false and misleading. Yet, the Audit Committee Defendants wholly abdicated their responsibilities to the Company and its shareholders by consciously disregarding their duty of oversight, allowing the Company to issue the materially false and misleading statements, and failing to ensure that reliable systems of controls were implemented and functioning effectively to prevent the Company from issuing materially false and misleading statements. Accordingly, defendants Clark, Kolb, Kriegshauser, and Wagner face a substantial likelihood of liability and any demand upon them would be futile.

59.     In addition, the magnitude of the Company's second quarter earnings miss was so great that the Board must have known and/or had reason to suspect that the statements described above were materially false and misleading. In particular, the Company reported adjusted second quarter 2011 EPS of $2.46 per share, over 38% below the consensus estiamates of $3.98 per share. EBITDA was approximately $276.6 million, approximately 35% below the consensus of $424.4 million. Revenue were $773.0 million compared to consensus estimates of $914.5 million. Due to the magnitude of the miss, the Board must have known and/or had reason to

suspects that the Company's disclosures were materially false and misleading and that the Company's internal controls related to financial reporting were inadequate.

### *The Members of the Board of Directors Lack Independence*

60.    Defendant Scheller lacks independence. Scheller has been the Company's CEO since September 12, 2011 and has served as Preisdent and COO of the Company's primary subsidiary, Jim Walter Resources since June 2010. Scheller was paid $1.1 million in total compensation by the Company in 2010. Furthermore, in connection with Scheller's appointment to director and CEO of Walter, Scheller has entered into a letter agreement (the "Letter Agreement") with the Company dated as of September 12, 2011. The Letter Agreement entitles Scheller to an annual base salary of $750,000. In addition, Scheller also remains eligible to participate in the Company's Executive Incentive Plan and, in this position, earn an annual target bonus of 100% of annual base salary, with an upside potential of 200% of annual base salary for top performance. Pursuant to the terms of the Letter Agreement, Scheller will remain a participant in the Company's long-term incentive plan and will be eligible to receive annual equity grants from the Company. Scheller's annual equity grant in respect of the 2012 fiscal year will be valued at 150% of his annual base salary, based on the Black-Scholes value at the date of grant, 50% of which will be in the form of non-qualified stock options and 50% of which will be in the form of restricted stock units. In connection with his promotion to the position of Chief Executive Officer, on or prior to October 12, 2011, Scheller received a one-time equity grant from the Company valued at $1,000,000. Accordingly, defendant Scheller's principal source of income is based on his employment with the Company. Because of his dependence on the Company for continued compensation, he is beholden to the Company and lacks sufficient

independence with which to render a disinterested decision on whether to pursue the derivative claims.

61.     Defendant Leonard lacks independence from the Company. Leonard has served as interim CEO of the Company on two occasions, including between July 31, 2011 through September 12, 2011, a portion of the Relevant Period. As acknowledged in the 2011 Proxy, "Mr. Leonard, our Company's interim Chief Executive Officer, cannot be deemed independent under the NYSE listing standards due to his employment relationship with the Company."

62.     Defendants Tokarz, Kolb, Rethore, Leonard, and Clark have served on the Board of Mueller together since 2006, when Mueller was spun off by Walter Industries, (now the Company) in 2006. Walter is now a supplier of Mueller. Because of their personal and professional relationships with each other, Defendants Tokarz, Kolb, Rethore, Leonard and Clark are incapable of bringing suit against each other on behalf of the Company. Accordingly, demand on Defendants Tokarz, Kolb, and Clark is futile.

63.     Lastly, plaintiff has not made a demand on the Board to bring the causes of action alleged herein because such a demand would be a futile and useless act for the following additional reasons:

> a. The Board members, because of their inter-related business, professional and personal relationships with the Individual Defendants, have developed debilitating conflicts of interest that prevent them from taking the necessary and proper action on behalf of the Company as requested herein.
>
> b. The Board members, as more fully detailed herein, participated in, approved, and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise same. Each of the Board members exhibited a sustained and systematic failure to fulfill their fiduciary duties, which could not have been an exercise of good faith business judgment and amounted to gross negligence and extreme recklessness.

    c.  In order to bring this suit, the Board members would be forced to sue themselves and persons with whom they have extensive business and personal entanglements, which they will not do, thereby excusing demand.

    d.  The acts complained of constitute violations of the fiduciary duties owed by Walter's officers and directors and these acts are incapable of ratification.

    e.  Walter has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Board members have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Walter any part of the damages Walter suffered and will suffer thereby.

    f.  The actions of the directors have impaired the Board's ability to validly exercise its business judgment and rendered it incapable of reaching an independent decision as to whether to accept Plaintiff's demands.

    g.  Any suit by the directors of Walter to remedy these wrongs would likely expose the Individual Defendants and Walter to further violations of securities laws which could result in additional civil actions being filed against one or more of the Individual Defendants, thus they are hopelessly conflicted in making any supposedly independent determination as to whether to sue themselves.

64.    Accordingly, for all of these reasons, making a pre-suit demand on the Board would be futile and is therefore excused.

65.    Plaintiff has not made a demand on the shareholders of Walter to institute this action because such demand would be a futile and useless act for at least the following reasons: (a) Walter is a publicly held company with approximately 62.4 million shares outstanding as of October 31, 2011, and thousands of shareholders; (b) making demand on such a large number of shareholders would be impossible for Plaintiff, who has no way of learning the names, addresses or phone numbers of all the Company's shareholders; and (c) making demand on all shareholders would force Plaintiff to incur huge expenses, assuming all shareholders could be individually identified.

## COUNT I

**AGAINST ALL INDIVIDUAL DEFENDANTS FOR BREACH OF FIDUCIARY DUTY**

66.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

67.     The Individual Defendants all owed a fiduciary duty to Walter and its stockholders, the duty to exercise loyalty, good faith, due care and diligence in the management and administration of the affairs of the Company, as well as in the auditing and financial reporting of the Company, and owed the duty of full and candid disclosure of all material facts relating thereto.

68.     As fiduciaries, to discharge these duties, the Individual Defendants were required to exercise prudent supervision over the management, policies, practices, controls, and financial and corporate affairs of Walter.

69.     In performing the aforementioned services, the Individual Defendants all breached their fiduciary duties, causing damages to Walter, by, *inter alia,* (i) failing to properly implement, oversee and maintain appropriate and adequate internal controls, practices and procedures for Walter and ensure that a proper reporting system was in place; (ii) failing to ensure that Walter operated in compliance with all applicable federal and state laws, rules, and regulations requiring the dissemination of accurate financial statements and restricting the misuse of material non-public information; (iii) failing to ensure that Walter not engage in any unsafe, unsound, or illegal business practices; and (iv) causing Walter to be sued for, and exposed to, liability for violations of the federal securities laws. The improprieties described herein would not have occurred but the for the Individual Defendants' intentional wrongdoing and/or conscious or reckless disregard for their oversight responsibilities.

36

70.     The Individual Defendants' breaches of their fiduciary duties have proximately caused, and will continue to cause, Walter to suffer substantial monetary damages as a result of the wrongdoing herein, as well as further and even greater damage in the future, including, among other things:

    a.   damage to Walter's reputation, goodwill, and standing in the business community, as well as the resultant loss of business and business opportunities;

    b.   legal fees, costs and potentially huge amounts payable in settlement or satisfaction of class action lawsuits alleging violations of federal and state laws;

    c.   the costs incurred in initiating an internal review or an internal investigation into the improprieties engaged in by the defendants;

    d.   costs incurred from compensation and benefits paid to the defendants who have breached their duties to Walter.

    e.   increased cost of capital; and

    f.   a loss in market value and shareholder equity.

71.     Walter has been directly and substantially injured by reason of the Individual Defendants' intentional breach and/or reckless and conscious disregard of their fiduciary duties to the Company. Plaintiff, as a shareholders and representatives of the Company, seek damages and other relief for the Company, in an amount to be proven at trial.

72.     Plaintiff, on behalf of the Company, has no adequate remedy at law.

## COUNT II

## AGAINST THE INDIVIDUAL DEFENDANTS FOR UNJUST ENRICHMENT

73.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

74.     By their wrongful acts, omissions, and breaches of fiduciary, the Individual Defendants were unjustly enriched at the expense of and to the detriment of Walter. The Individual Defendants were unjustly enriched as a result of the compensation and director remuneration they received while breaching fiduciary duties owed to Walter.

75.     Plaintiff, on behalf of Walter, seeks restitution from the Individual Defendants and each of themselves, and seeks an order of this Court disgorging all profits, benefits and other compensation obtained by the Individual Defendants from or in the course of their wrongful conduct and fiduciary breaches.

76.     Plaintiff, on behalf of Walter, has no adequate remedy at law

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

A.     Against all of the Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties;

B.     Directing Walter to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect the Company and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote, resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote the following Corporate Governance policies: (1) a proposal to strengthen the Board's supervision of operations and to develop and implement procedures for greater shareholder input into the policies and guidelines of the Board; (2) a proposal to

strengthen Walter's oversight of its disclosure procedures; and (3) other measures to appropriately test and then strengthen, the internal audit and control functions that are so lacking in the Company.

C.    Awarding to Walter restitution from the Individual Defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by the Individual Defendants while they were in breach of their fiduciary duties;

D.    Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses;

E.    Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all claims set forth herein.


Dated: March 1, 2012

                                        Respectfully submitted,


                                         s/  Brannon J. Buck
                                        W. Percy Badham III (ASB-2147-D51W)
                                        pbadham@badhambuck.com
                                        Brannon J. Buck (ASB-5848-K56B)
                                        bbuck@badhambuck.com
                                        Brett A. Ialacci (ASB-7679-E67I)
                                        bialacci@badhambuck.com
                                        *Attorneys for Plaintiff*

OF COUNSEL:
BADHAM & BUCK, LLC
2585 Wells Fargo Tower
420 20th Street North
Birmingham, Alabama 35203
Phone: (205) 521-0036
Fax: (205) 521-0037

LEVI & KORSINSKY, LLP
Nicholas I. Porritt, Esq.
Eduard Korsinsky, Esq.
30 Broad Street, 15th Floor
New York, New York 10004
Phone: (212) 363-7500
Fax: (212) 363-7171

**PLEASE SERVE ALL DEFENDANTS VIA CERTIFIED MAIL AT THE FOLLOWING ADDRESS:**

Walter Energy, Inc.
c/o Registered Agent
CT Corporation System
2 North Jackson Street, Suite 605
Montgomery, Alabama 36104

## **VERIFICATION**

I, Robert Makohin, under penalties of perjury, hereby do declare that I am a plaintiff in the foregoing complaint, that I have read the complaint, and that the facts therein are true to my own knowledge, except to matters stated therein to be alleged upon information and belief, and as to those matters, I believe them to be true and correct to the best of my knowledge, information, and belief.

Dated: February _14_, 2012

Robert Makohin